# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **CRIMINAL COMPLAINT** |
| v. | : |
| MORDCHAI FISH, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," LAVEL SCHWARTZ, a/k/a "Albert Schwartz," and DAVID S. GOLDHIRSH | : Mag. No. 09-3614 : |

I, Robert J. Cooke, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From in or about February 2009 to in or about April 2009, in Monmouth County, in the District of New Jersey, and elsewhere, defendants MORDCHAI FISH, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," LAVEL SCHWARTZ, a/k/a "Albert Schwartz," DAVID S. GOLDHIRSH and others did:

> knowingly and willfully conspire to conduct and attempt to conduct financial transactions involving property represented to be the proceeds of specified unlawful activity, specifically, trafficking in counterfeit goods, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3).

In violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made a part hereof.

*Robert J. Cooke*
Robert J. Cooke, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2009, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

Attachment A

I, Robert J. Cooke, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein, based upon my own participation in this investigation, as well as information provided to me by other law enforcement officers. Because this Attachment A is submitted for the limited purpose of establishing probable cause, I have not included herein the details of every aspect of this investigation. Statements attributable to individuals contained in this Attachment are related in substance and in part, except where otherwise indicated. All contacts discussed herein were recorded, except as otherwise indicated.

1. Defendant Mordchai Fish, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," ("defendant FISH"), a resident of Brooklyn, New York, served as a rabbi at Congregation Sheves Achim, a synagogue located in Brooklyn. Defendant FISH operated several charitable tax-exempt organizations in conjunction with his synagogue, including one called "BGC" and another called "Levovos." A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant FISH does not hold a license to transmit or remit money.

2. Defendant Lavel Schwartz, a/k/a "Albert Schwartz," ("defendant SCHWARTZ"), a resident of Brooklyn, was the brother of defendant FISH and also served as a rabbi. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant SCHWARTZ does not hold a license to transmit or remit money.

3. Defendant David S. Goldhirsh ("defendant GOLDHIRSH") was a resident of Brooklyn. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant GOLDHIRSH does not hold a license to transmit or remit money.

4. At all times relevant to this Complaint, there was a cooperating witness (the "CW") who had been charged in a federal criminal complaint with bank fraud in or about May 2006. Pursuant to the FBI's investigation and under its direction, the CW from time to time represented that the CW purportedly was engaged in illegal businesses and schemes including bank fraud, trafficking in counterfeit goods and concealing assets and monies in connection with bankruptcy proceedings.

5. On or about February 17, 2009, the CW received an interstate telephone call in New Jersey from defendant FISH in New York, during which the CW confirmed that the CW should make the bank check that the CW would be bringing the following day as

1

part of a money laundering transaction payable to a charitable organization, or "gemach," called BGC, which was administered by defendant FISH. The CW also was informed by defendant FISH that they would be meeting an individual to whom the CW had never been introduced. The CW also confirmed that they would be meeting "tomorrow morning [at] 10 o'clock," and learned that the CW was to meet defendant FISH in Boro Park.

6. On or about February 18, 2009, defendant FISH met the CW in the Boro Park section of Brooklyn. At the start of the meeting, defendant FISH entered the CW's car and immediately informed the CW that defendant FISH had recently met with the "main guy" running a money laundering network. Defendant FISH stated that "[t]he main guy is in Boro Park," and described him as part of "the whole chain." The two then traveled to a shop specializing in chocolates located on Lee Avenue in Brooklyn where FISH took possession from the CW of a $50,000 bank check, drawn upon a bank in Monmouth County, New Jersey, made payable to BGC, defendant FISH's charitable organization, as directed by defendant FISH. The CW indicated that the proceeds of the check were generated by "the handbag business, the profits." The CW assured defendant FISH that "[m]y name is not on the company. I don't show up anywhere. There's no trace to me." As to the individual who defendant FISH and the CW were planning to meet, defendant FISH cautioned "[n]o one knows your name. No one should know your name." Defendant FISH and the CW then walked to an address on Hooper Street in Brooklyn at which time they were joined by defendant SCHWARTZ. Defendant FISH then indicated his preference for doing a large-scale "one-shot" money laundering transaction and asked the CW if the CW had one million dollars to launder. The CW replied that the CW might be able to launder $300,000. The CW then inquired about completing the laundering transaction with an individual with whom defendant FISH and the CW had conducted a laundering transaction on February 10, 2009, but defendant FISH explained that they were dealing with "one network," and indicated that the individual with whom they had met on February 10, 2009 was "not the main guy." Defendant FISH, as he placed a call to an unknown individual, cautioned the CW that when speaking with members of this money laundering network on the telephone, "[e]verything is code." At the end of the phone call, defendant FISH indicated that they would be meeting with the individual with whom he had just spoken around the block, but warned "[d]on't ask him about anything." Defendant FISH reiterated that "[i]t's a whole chain," and indicated that the "main guy [from] Boro Park" had told defendant FISH to get a different cell phone.

7. Defendant FISH and the CW then departed the Hooper Street residence and met another individual, subsequently identified as defendant GOLDHIRSH, on the street a few blocks away. The CW then followed defendants FISH and GOLDHIRSH into a

mikva located on Williamsburg Avenue in Brooklyn, and the three sat down at a table in a room containing lockers. Defendants FISH and GOLDHIRSH conversed at length in Yiddish, until the CW subsequently explained that the bank check the CW had given to defendant FISH was from a bank in New Jersey. Defendant GOLDHIRSH expressed concern that the funds from the check might have been drawn upon a line of credit, but the CW explained that the check represented profits from the CW's counterfeit handbag business. The CW told defendant GOLDHIRSH that "I have a [u/i] New Jersey bag business. You know, we make, you know, we have like Prada, Gucci, the fancy bags." The CW added that "I make them. It costs me like $20. I sell them on the streets for 200 or whatever." The CW then gestured toward the check and stated that the funds came from "[o]ut of profits from the bag business. This is not a credit line." Defendant GOLDHIRSH then related a story in which he had been provided with a $60,000 check which had bounced. As the conversation continued, the CW asked "[y]ou've got family in Lakewood? What's your last name? David . . ." Defendant GOLDHIRSH responded simply by stating his last name. Defendant GOLDHIRSH then provided defendant FISH with a large quantity of cash, but defendant FISH informed the CW that they were $10,000 short, thus indicating that defendant GOLDHIRSH had provided approximately $35,000 in return for the CW's check which defendant GOLDHIRSH had taken. After further discussions with defendant GOLDHIRSH during which defendant GOLDHIRSH placed a telephone call, defendant FISH informed the CW that he and the CW would travel to a nearby location to pick up the remaining cash that was due in exchange for the check.

8. Defendant FISH and the CW then walked to an address on Penn Avenue in Brooklyn and climbed to the second floor where they were let into a residence. An older male and a woman greeted defendant FISH, and all four sat at a dining room table. The CW was then provided with a bag containing approximately $10,000. After defendant FISH and the CW left this residence and returned to the CW's car, defendant FISH explained that the money laundering network was effectively closed, stating that there were "[n]o new guys coming in." Defendant FISH also explained that "[t]he main guy is my neighbor," and indicated that FISH had been referred to him by another coconspirator who was currently in London. Defendant FISH and the CW then returned to the Hooper Street residence where they were joined by defendant SCHWARTZ. The three then proceeded to count all the cash that had been received from defendant GOLDHIRSH and the older couple. After the counting had been completed, the CW departed with approximately $45,000 in cash.

9. On or about February 18, 2009, the CW placed an interstate telephone call from New Jersey to defendant FISH in New York. The CW told defendant FISH that "I, uh, brought everything to my guy in, uh, over there," and then referred to

3

the "gemoras"--a code word used by FISH to refer to cash. The CW further told defendant FISH that "everything's counted 45 to the, to the tee, no problems," thereby indicating that the CW had received exactly $45,000 from defendants FISH and SCHWARTZ out of the money supplied by defendant GOLDHIRSH and the older couple in exchange for the $50,000 bank check made out to BGC. Defendant FISH, who had apparently failed to receive the entire amount of his commission for arranging the transaction then asked the CW to return to Brooklyn so that they could recount the cash. The CW, who in actuality provided the cash to FBI agents, informed defendant FISH that the CW no longer had the cash "because I had to give it to the guy. He's been waiting. It's been overdue."

10. On or about April 21, 2009, defendant FISH placed an interstate telephone call from New York to the CW in New Jersey to discuss a money laundering transaction planned for the following day. During the conversation, defendant FISH stated "I have two guys" who were potential sources of the cash for the deal, but defendant FISH indicated that he did not know "who gets [the cash] faster." Defendant FISH indicated that he might be notified at 1 a.m. or 2 a.m. that night. Defendant FISH also informed the CW that if defendant FISH called to inquire, they might be required to launder $200,000 rather than $100,000. The CW replied "[t]ell the guy we'll do a hundred . . . tomorrow" and then indicated "then a hundred . . . on Thursday." Defendant FISH replied "[f]ine. I already told him. . . . No problem."

11. On or about April 22, 2009, defendant FISH in New York received an interstate telephone call from the CW in New Jersey during which the two discussed to whom the bank check should be made payable. The CW, understanding that only $50,000 was available that day, asked "[s]o they have 50 gemoras now?" Defendant FISH confirmed this and instructed the CW to make the check payable to his charitable organization, BGC. During a subsequent interstate telephone call from defendant FISH to the CW in New Jersey, defendant FISH further instructed the CW to bring another check in the amount of $10,000 made payable to Levovos, another charitable organization operated by defendant FISH.

12. On or about April 22, 2009, defendant FISH met the CW in the Boro Park section of Brooklyn to conduct another money laundering transaction. The two met at a restaurant on Lee Avenue in Brooklyn, at which time defendant FISH asked the CW, referring to the bank checks that defendant FISH had asked the CW to bring, "[y]ou have it with you?" The CW replied "[y]eah, yeah. I have the checks, no problem," at which time the CW handed defendant FISH the three bank checks drawn upon a bank in Monmouth County which were made out to the charitable organizations as directed by defendant FISH. As the CW handed the checks to defendant FISH, the CW noted that the checks were

4

"[f]ifty [thousand] and forty [thousand] for that BGC whatever, and then ten thousand to Levovos." Subsequently, defendant FISH expressed his concern about what he would say if he was questioned about the source of the money for the checks, and the CW pointed out that "[y]ou can't tell him it's from the knock-off pocketbook business." Defendant FISH also indicated that he was not sure whether the entire $90,000 in cash would be available that day, and told the CW that "[i]f you had called me Sunday, then I would have had here two hundred . . . Tuesday morning, two hundred thousand, but, but you did not, you did not call me."

13. A short time later, defendant FISH and the CW drove to another part of Brooklyn, and parked near the intersection of Broadway and Diggs Avenue. The two exited the vehicle and were met on the sidewalk by defendant GOLDHIRSH. After defendants FISH and GOLDHIRSH conversed for a brief period, all three individuals got back into the car. Defendant GOLDHIRSH handed the CW a white envelope containing a large amount of cash. The CW asked "[h]ow much is in here? Thirty?" Defendant GOLDHIRSH responded "I, I give you [u/i] fifty [thousand]." Defendant FISH explained that "I only have fifty [thousand] now, and then [u/i] tomorrow, we have another one." Subsequently, the CW asked defendant FISH to "[g]ive [the CW] the one for fifty only, right?" Defendant GOLDHIRSH asked "[h]ow many checks here?" The CW replied that "[w]e have three--one for you," and encouraged defendant GOLDHIRSH to "do more business with us." The CW noted that "I got a lot of profits from my, from my pocketbook business. . . I make handbags in New Jersey." Defendant GOLDHIRSH replied "[y]eah," and the CW elaborated by saying "[y]ou know, Gucci, Prada, like that. Those, you know, the fancy companies. I make the ones, like the similar, imitation, and I sell 'em for three, four hundred dollars. The other ones sell for three thousand. So . . . we made a lot of money." A short while later, defendant GOLDHIRSH departed, taking the $50,000 bank check with him.

14. Defendant FISH and the CW then drove to the residence on Hooper Street and were met on the lower floor by defendant SCHWARTZ. The CW opened the plastic bag containing the cash which had been provided by defendant GOLDHIRSH, and the CW and defendant FISH began counting the cash. A short while later, defendant SCHWARTZ joined defendant FISH and the CW and began counting bundles of cash as well. During the meeting, the CW provided defendant FISH with the $10,000 bank check made out to Levovos, a charitable organization operated by defendant FISH. At the conclusion of the counting process, the CW retained a total of approximately $54,000 in cash in exchange for the two bank checks totaling $60,000. Before departing, the CW and defendant FISH discussed the possibility of consummating another laundering transaction the following day, and FISH indicated that he would attempt to arrange for another cash delivery.

5

15. Between in or about February 2009 and in or about April 2009, defendants FISH, SCHWARTZ and GOLDHIRSH engaged in money laundering transactions with the CW totaling approximately $100,000 in funds represented by the CW to involve the proceeds of criminal activities.